441 F.3d 96
 John Paul HANKINS, Plaintiff-Appellant,
v.
Ernest S. LYGHT and New York Annual Conference of the United Methodist Church, Defendants-Appellees,
Stony Brook Community Church, Defendant.
Docket No. 04-0743-CV.
 United States Court of Appeals, Second Circuit.
 Argued: January 5, 2005.
 Decided: February 16, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Bruce Miles Sullivan, Stony Brook, New York, for Plaintiff-Appellant.
 Frederick K. Brewington, Hempstead, New York, for Defendants-Appellees.
 Before: WINTER, SOTOMAYOR, and B.D. PARKER, Circuit Judges.
 Judge SOTOMAYOR dissents in a separate opinion.
 WINTER, Circuit Judge.
 
 
 1
 John Paul Hankins appeals from the dismissal by Judge Hurley of his age discrimination action. Hankins was a clergy member ordained by appellee New York Annual Conference of the United Methodist Church ("NYAC"). He was forced into retirement when he attained the age of 70. Appellee Ernest S. Lyght is the Bishop of the NYAC and has the power to appoint clergy to NYAC churches.
 
 
 2
 Hankins claims that the NYAC's mandatory retirement policy violates the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. We hold that the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb et seq., is constitutional as applied to federal law; it therefore amended the ADEA and governs the merits of the principal issue raised by the parties. We vacate the dismissal of Hankins' complaint and remand for a determination of whether application of the ADEA to Hankins' relationship with the NYAC and Lyght violates the RFRA.
 
 BACKGROUND
 
 3
 We assume the existence of the facts as alleged in the complaint. Hankins was ordained by the NYAC and served as a clergy member from 1962 to July 1, 2003. He turned 70 on November 5, 2002, and was forced into retirement on July 1, 2003, as prescribed by paragraph 356 of the Methodist Book of Discipline.
 
 
 4
 According to a statement by the Methodist Church's Council of Bishops, the Book of Discipline is neither "sacrosanct" nor "infallible, but . . . is the most current statement of how United Methodists agree to live together" as "an inclusive society without regard to ethnic origin, economic condition, gender, age, or the disabilities of its constituents." The complaint alleges that the Book of Discipline contains "subject matters that are sectarian and ecclesiastical in nature[,] being related to the nature of the Deity and the Trinity, the scriptures, the tenets of the United Methodist Church, the theological grounding of biblical faith, the teachings of John Wesley and/or other religious principles or values (. . . `religious considerations')," as well as "subject matters that are secular, temporal and/or civil in nature[,] not being determined, controlled or influenced by any religious considerations." The complaint further claims that paragraph 356, under which Hankins was mandatorily retired, "is a secular, temporal, and/or civil subject matter, not being determined, controlled or influenced by any religious considerations."
 
 
 5
 Bishop Lyght told Hankins and other members of the Church that he had the authority to reappoint Hankins as pastor, despite the fact that Hankins is over 70 years old. However, Bishop Lyght also stated that it is his "personal policy (as distinguished from the policy set forth in the Book of Discipline) never to reappoint members of the clergy who have attained age seventy to the church out of which they were retired."
 
 
 6
 Appellant brought an age discrimination charge to the Equal Employment Opportunity Commission ("EEOC") on March 19, 2003. The EEOC issued a Notice of Right to Sue on April 11, 2003. Appellant also filed a Verified Complaint with the New York Division of Human Rights on June 11, 2003; that Complaint was dismissed for administrative convenience on July 1, 2003. Appellant filed the instant suit on July 3, 2003.
 
 
 7
 Appellant's complaint claimed that the mandatory retirement policy violated the ADEA, the New York Human Rights Law, and the NYAC's covenant with him (Counts I, II, and IV); and that Bishop Lyght's personal policy against reappointing retired clergy violated the ADEA and Human Rights Law (Count III).[1]
 
 
 8
 Appellees moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, under Rules 12(b)(1) and (6) respectively. The district court, ruling orally, declined to decide the 12(b)(1) motion, which was apparently based on deficiencies in the EEOC's review of appellant's charge. Instead, the court granted the 12(b)(6) motion based on a "ministerial exception" to the ADEA — a rule adopted by several circuits that civil rights laws cannot govern church employment relationships with ministers without violating the free exercise clause because they substantially burden religious freedom. See, e.g., McClure v. Salvation Army, 460 F.2d 553, 560 (5th Cir.1972) (applying Title VII to church-minister relationship "would result in an encroachment by the State into an area of religious freedom into which it is forbidden to enter" by the Free Exercise Clause). The court dismissed the complaint under Rule 12(b)(6).
 
 DISCUSSION
 
 9
 Appellant argues that the ministerial exception should not insulate a church's nonreligious regulations that discriminate against ministers on the basis of age. Appellees assert that this action is barred by EEOC errors. Alternatively, they continue to rely upon "the ministerial exception," the Free Exercise clause, and the Establishment Clause, claiming that applying the ADEA to the church-minister relationship would substantially burden religion. In that regard, appellees note that "for this very reason" Congress passed the RFRA. We address the alleged EEOC errors before turning to the main issue: whether the RFRA amended the ADEA.
 
 
 10
 a) Completion of Administrative Proceedings
 
 
 11
 Appellees argue that the district court lacked jurisdiction because the EEOC issued appellant's Notice of Right to Sue fewer than sixty days after his charge was filed.[2] We disagree.
 
 
 12
 Appellant satisfied all statutory requirements for bringing this private action under the ADEA. He filed an age discrimination charge with the EEOC on March 19, 2003; the EEOC issued a Notice of Right to Sue on April 11, 2003. Under 29 U.S.C. § 626(d) and (e), appellant had to file the instant suit more than sixty days after filing his EEOC complaint and within ninety days of his receipt of the EEOC Notice. Hankins complied with both requirements by filing suit on July 3, 2003 — more than 60 days after March 19, and 83 days after April 11. Furthermore, contrary to appellees' arguments, the instant suit was not barred by appellant's June 11, 2003 filing of a Complaint with the New York Division of Human Rights because the Division dismissed the complaint on July 1, 2003, before appellant filed this suit. See 29 U.S.C. § 633(b) (ADEA prohibits bringing suit before 60 days after commencement of state proceedings, "unless such proceedings have been earlier terminated").
 
 
 13
 Appellees rely for their jurisdictional contention on two Title VII cases: Martini v. Fed. Nat'l Mortgage Ass'n, 178 F.3d 1336 (D.C.Cir.1999), and Rodriguez v. Connection Tech. Inc., 65 F.Supp.2d 107 (E.D.N.Y.1999). These cases inferred from the language of 42 U.S.C. § 2000e-5(f)(1)[3] that the EEOC lacks authority to issue right-to-sue notices based on Title VII claims before 180 days after a charge is filed. E.g., Martini, 178 F.3d at 1347 ("[T]he EEOC's power to authorize private suits within 180 days undermines its express statutory duty to investigate every charge filed, as well as Congress's unambiguous policy of encouraging informal resolution of charges up to the 180th day."). We have not decided whether the regulation allowing early issuance of right-to-sue notices, 29 C.F.R. § 1601.28(a)(2), is a permissible construction of Section 2000e-5. We express no opinion on the issue here, although we note that two circuits and several district courts within this circuit have disagreed with Martini and Rodriguez. Sims v. Trus Joist MacMillan, 22 F.3d 1059, 1061-63 (11th Cir.1994) (early issuance of right-to-sue letter by EEOC does not bar a Title VII suit); Saulsbury v. Wismer & Becker, Inc., 644 F.2d 1251, 1257 (9th Cir.1980) (same); Commodari v. Long Island Univ., 89 F.Supp.2d 353, 381-83 (E.D.N.Y.2000) (same); Palumbo v. Lufthansa German Airlines, 1999 U.S. Dist. LEXIS 11412, No. 98 Civ. 5005, 1999 WL 540446, at *2 (S.D.N.Y. July 26, 1999) (same); Figueira v. Black Entm't Television, Inc., 944 F.Supp. 299, 303-08 (S.D.N.Y.1996) (same).
 
 
 14
 The key fact in the present matter is that the language of 29 U.S.C. § 626, which authorizes suits under the ADEA, differs significantly from that of Section 2000e-5(f)(1). Section 626 provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]." Id. § 626(d). Appellant complied with this provision by waiting sixty days after filing his EEOC charge before bringing the instant suit. The fact that the EEOC terminated its proceedings prior to the expiration of sixty days was irrelevant to the district court's authority to entertain the case. This is especially so because Section 626, unlike Section 2000e-5, explicitly contemplates early termination of EEOC investigations. Id. § 626(e) ("If a charge filed with the [EEOC] under this chapter is dismissed or the proceedings of the [EEOC] are otherwise terminated by the [EEOC], the [EEOC] shall notify the person aggrieved."). This suit was therefore properly before the district court.
 
 
 15
 b) The Religious Freedom Restoration Act
 
 
 16
 In our view, the dispositive issue in this matter concerns the application of the RFRA. The statute's substantive provisions state:
 
 
 17
 (a) In general. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
 
 
 18
 (b) Exception. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
 
 
 19
 (1) is in furtherance of a compelling governmental interest; and
 
 
 20
 (2) is the least restrictive means of furthering that compelling governmental interest.
 
 
 21
 42 U.S.C. § 2000bb-1.
 
 
 22
 The test set out in Subsection (b)(1) and (2) "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." Id. § 2000bb-3(a). The RFRA's remedial provision states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." Id. § 2000bb-1(c). "[G]overnment" is in turn defined to include any "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." Id. § 2000bb-2(1).
 
 
 23
 The present action is a suit against a church and an official of that church. The suit claims that the defendants violated a federal statute, the ADEA, and seeks judicial remedies; appellees claim that application of the statute would substantially burden the exercise of their religion. If the RFRA's test for evaluating burdens on religious activity — Subsections (b)(1) and (2) — is not met, appellees can arguably assert a violation of the RFRA as a complete defense.
 
 
 24
 The district court dismissed the case based on a "ministerial exception" that some courts had read into various antidiscrimination laws — an unresolved issue in this circuit — including the ADEA. Whatever the merits of that exception as statutory interpretation or policy, it has no basis in statutory text, whereas the RFRA, if applicable, is explicit legislation that could not be more on point. Given the absence of other relevant statutory language, the RFRA must be deemed the full expression of Congress's intent with regard to the religion-related issues before us and displace earlier judge-made doctrines that might have been used to ameliorate the ADEA's impact on religious organizations and activities. City of Milwaukee v. Illinois, 451 U.S. 304, 314, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("Federal common law is a necessary expedient, and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears.") (internal quotation marks and citations omitted).
 
 
 25
 There is little caselaw addressing the issue whether the RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion.[4] The RFRA's language surely seems broad enough to encompass such a case. The statutory language states that it "applies to all federal law, and the implementation of that law," 42 U.S.C. § 2000bb-3(a), and that a defendant arguing that such a law substantially burdens the exercise of religion "may assert [a violation of the RFRA] as a . . . defense in a judicial proceeding." Id. § 2000bb-1(c). This language easily covers the present action. The only conceivably narrowing language is the phrase immediately following: "and obtain appropriate relief against a government." Id. However, this language would seem most reasonably read as broadening, rather than narrowing, the rights of a party asserting the RFRA. The narrowing interpretation — permitting the assertion of the RFRA as a defense only when relief is also sought against a governmental party — involves a convoluted drawing of a hardly inevitable negative implication. If such a limitation was intended, Congress chose a most awkward way of inserting it. The legislative history is neither directly helpful nor harmful to that view.
 
 
 26
 We need not, however, decide whether the RFRA applies to a federal law enforceable only in private actions between private parties. The ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party. See United States v. Brown, 79 F.3d 1550, 1559 n. 16 (11th Cir.1996) ("The meaning of the statutory words `scheme to defraud' does not change depending on whether the case is Civil RICO or criminal."). An action brought by an agency such as the EEOC is clearly one in which the RFRA may be asserted as a defense, and no policy of either the RFRA or the ADEA should tempt a court to render a different decision on the merits in a case such as the present one. Indeed, appellant argues that the RFRA is inapplicable only because it is unconstitutional.
 
 1. Waiver
 
 27
 First, however, we must address whether appellees have waived or forfeited reliance upon the RFRA. In their original brief, as noted, appellees argued that the ADEA was an unlawful burden on their religious activities and that Congress has enacted the RFRA, a statute that applied to all federal laws, "for this very reason." Appellant's Brief at 28. Believing that this reference to a seemingly dispositive but otherwise unmentioned statute needed some elaboration and unconvinced that appellant's claim that the Supreme Court had held the RFRA unconstitutional in all circumstances was correct, we asked for further briefing.
 
 
 28
 Somewhat to our surprise, appellees' post-argument letter-brief states that, although all pertinent portions of the RFRA are constitutional, the statute is inapplicable because "the case at bar is a matter relating to a private employment situation and does not involve actions by the government." Nevertheless, appellees continue to rely upon the "ministerial exception" and the Free Exercise and Establishment Clauses.
 
 
 29
 In our view, as discussed above, the RFRA's provisions are directly on point, and allow parties who, like appellees, claim that a federal statute, like the ADEA, substantially burdens the exercise of their religion to assert the RFRA as a defense to any action asserting a claim based on the ADEA. The issue then is whether their post-argument letter-brief constitutes a waiver or forfeiture of that defense.
 
 
 30
 A party may certainly waive or forfeit a RFRA defense by failing to argue that a law or action substantially burdens the party's religion. For example, in United States v. Amer, appellant had forfeited the defense that his child kidnaping conviction violated the RFRA, because "[a]t no point during the pretrial, trial, or sentencing proceedings did [appellant] argue that his act of removing and retaining the children was religiously mandated or inspired." 110 F.3d 873, 879 & n. 1 (2d Cir.1997). Where a party fails to assert a substantial burden on religious exercise before a district court, therefore, the party may not raise that issue — an inherently fact-based one — for the first time on appeal.
 
 
 31
 However, appellees argued in the district court and here — and continue to argue — that application of the ADEA to the relationship between their church and appellant substantially burdens their religion. They continue to assert the "ministerial exception," which in their view tracks the Free Exercise clause of the Constitution and the Establishment Clause as well. Appellees' Brief at 4-15; see Elvig v. Calvin Presbyterian Church, 397 F.3d 790, 790 (9th Cir.2005) ("[T]he `ministerial exception' to Title VII is carved out from the statute based on the commands of the Free Exercise and Establishment Clauses of the First Amendment."). In substance, therefore, they ask us to apply the RFRA, but not to mention it.
 
 
 32
 Appellees' position that the RFRA does not apply to suits between private parties is not determinative of our analysis, given that they have vigorously pursued and preserved the substance of the issue. We are required to interpret federal statutes as they are written — in this case the ADEA as amended by the RFRA — and we are not bound by parties' stipulations of law. Becker v. Poling Transp. Corp., 356 F.3d 381, 390 (2d Cir. 2004); see also Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). We are not in the business of deciding cases according to hypothetical legal schemes, particularly when the hypothetical scheme posed by a party tracks the actual law in all but name.
 
 2. Constitutionality
 
 33
 In addressing the constitutional issues raised by appellant with regard to the RFRA, we first describe the statutory background.
 
 
 34
 The RFRA was passed in response to Employment Div. v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Supreme Court held there that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id. at 879, 110 S.Ct. 1595 (internal quotation marks and citation omitted). Smith limited the applicability of the "compelling state interest" test the Court had previously applied to neutral laws before allowing them to place a substantial burden on religious practice. Id. at 883-84, 110 S.Ct. 1595 (limiting test to mean that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of `religious hardship' without compelling reason").[5]
 
 
 35
 Congress enacted the RFRA pursuant to two sources of authority, Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause of the Constitution. See H.R.Rep. No. 103-88, at 17 (1993) ("Finally, the Committee believes that Congress has the constitutional authority to enact [the RFRA]. Pursuant to Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause of the Constitution, the legislative branch has been given the authority to provide statutory protection for a constitutional value. . . ."). The Supreme Court held that the RFRA could not be enacted under Section 5 of the Fourteenth Amendment, which empowers Congress to enforce the Amendment's other provisions against the states. City of Boerne v. Flores, 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) ("Congress does not enforce a constitutional right by changing what that right is."). The RFRA is therefore unconstitutional as applied to state law.
 
 
 36
 However, the RFRA applies by its terms not only to the states but also to "all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993." 42 U.S.C. § 2000bb-3(a); see also id. § 2000bb-2(1) ("`[G]overnment' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."). Boerne could not have addressed whether the RFRA was validly enacted under the Necessary and Proper Clause because the only issue before the Court was the denial of a building permit to a church by local zoning authorities. 521 U.S. at 512, 117 S.Ct. 2157. Since Boerne, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir.2003); Guam v. Guerrero, 290 F.3d 1210, 1221 (9th Cir.2002); Henderson v. Kennedy, 265 F.3d 1072, 1073 (D.C.Cir.2001); Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir.2001); Christians v. Crystal Evangelical Free Church (In re Young), 141 F.3d 854, 856 (8th Cir.1998); see also Madison v. Riter, 355 F.3d 310, 315 (4th Cir.2003).
 
 
 37
 We join the other circuits in holding that the RFRA is constitutional as applied to federal law under the Necessary and Proper Clause of the Constitution. As presented in this case, the issue is simply whether Congress had the authority to amend the ADEA to include the RFRA standard. See In re Young, 141 F.3d at 861 (the RFRA "has effectively amended the Bankruptcy Code, and has engrafted the additional clause to § 548(a)(2)(A) that a recovery that places a substantial burden on a debtor's exercise of religion will not be allowed unless it is the least restrictive means to satisfy a compelling governmental interest.").
 
 
 38
 Congress enacted the ADEA pursuant to its Commerce Clause powers under Article I. Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 78, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("the ADEA constitutes a valid exercise of Congress' power `[t]o regulate Commerce . . . among the several States'") (citing EEOC v. Wyoming, 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)) (alterations in original); McGinty v. New York, 251 F.3d 84, 91 (2d Cir.2001); see U.S. Const., Art. I, § 8, cl. 3 ("The Congress shall have power . . . [t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes."). Furthermore, the Necessary and Proper Clause authorizes Congress "[t]o make all Laws which shall be necessary and Proper for carrying into Execution" its Article I powers, including its Commerce Clause powers. U.S. Const. art. I, § 8, cl. 18. The Clause allows all legitimate legislation "plainly adapted" to a constitutional end. M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819) ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."). Finally, the "plainly adapted" standard requires only "that the effectuating legislation bear a rational relationship to a permissible constitutional end." United States v. Wang Kun Lue, 134 F.3d 79, 84 (2d Cir.1998).
 
 
 39
 It is obvious to us that because Congress had the power to enact the ADEA, it also had the power to amend that statute by passing the RFRA. The RFRA was authorized by the Necessary and Proper Clause because its purpose — to protect First Amendment rights as interpreted by the Congress, see S.Rep. No. 103-111, at 14 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1903 — was permissible. "When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution." Boerne, 521 U.S. at 535, 117 S.Ct. 2157.
 
 
 40
 The RFRA was also proper as applied to the ADEA in particular because, as noted, Congress had authority to enact that statute under the Commerce Clause. See INS v. Chadha, 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("`Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction.'") (quoting Buckley v. Valeo, 424 U.S. 1, 132, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)) (internal citation omitted); Guerrero, 290 F.3d at 1220 ("Congress derives its ability to protect the free exercise of religion from its plenary authority found in Article I of the Constitution; it can carve out a religious exemption from otherwise neutral, generally applicable laws based on its power to enact the underlying statute in the first place."); In re Young, 141 F.3d at 861 ("[W]e can conceive of no argument to support the contention[] that Congress is incapable of amending the legislation that it has passed.").[6]
 
 
 41
 In his post-argument letter-brief, appellant argues that application of the RFRA to federal law violates separation of powers principles and the Establishment Clause of the Constitution.[7] We address these issues in turn.
 
 
 42
 Appellant's separation of powers challenge is that because the RFRA mandates evaluation of laws and actions that burden religion by a standard different from that prescribed by the Supreme Court, it is a Congressional usurpation of judicial power. However, we agree with the Eighth Circuit that "[t]he key to the separation of powers issue in this case is. . . not whether Congress disagreed with the Supreme Court's constitutional analysis, but whether Congress acted beyond the scope of its constitutional authority in applying RFRA to federal law." In re Young, 141 F.3d at 860; United States v. Marengo County Comm'n, 731 F.2d 1546, 1562 (11th Cir.1984) ("[C]ongressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place."). Indeed, "Congress has often provided statutory protection of individual liberties that exceed the Supreme Court's interpretation of constitutional protection." In re Young, 141 F.3d at 860 (collecting examples); Guerrero, 290 F.3d at 1221 ("Certainly Congress can provide more individual liberties in the federal realm than the Constitution requires without violating vital separation of powers principles."). That the RFRA provides more protection from federal actors and statutes than may be required by the First Amendment hardly undermines separation of powers principles.
 
 
 43
 With respect to appellant's Establishment Clause argument, the Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has established a three-prong test to determine whether a statute violates the Clause.
 
 
 44
 First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.
 
 
 45
 Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (quotations and citations omitted). Applying this test, the Court has held that exempting religious organizations from compliance with neutral laws does not violate the Constitution. E.g., Corp. of the Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 338-40, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (exemption from federal antidiscrimination laws for religious organizations does not violate Establishment Clause); see also Gillette v. United States, 401 U.S. 437, 460, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (exemption from military draft for religious conscientious objectors does not violate Establishment Clause); Walz v. Tax Comm'n, 397 U.S. 664, 680, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (state property tax exemption for religious organizations does not violate Establishment Clause).
 
 
 46
 Given these holdings, appellant faces an unwinnable battle in claiming that the RFRA — a limited exemption for religious organizations from compliance with neutral laws — violates the Establishment Clause. The RFRA had a secular legislative purpose within the meaning of Lemon — namely, to protect individual First Amendment rights as interpreted by the Congress. As noted, this purpose was not only permissible but was also required by Congress's duty to interpret the Constitution. Boerne, 521 U.S. at 535, 117 S.Ct. 2157. A "secular legislative purpose" need not be "unrelated to religion"; rather, Lemon's first prong aims to prevent Congress "from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." Amos, 483 U.S. at 335, 107 S.Ct. 2862; Gillette, 401 U.S. at 454, 91 S.Ct. 828 ("`Neutrality' in matters of religion is not inconsistent with `benevolence' by way of exemptions from onerous duties, so long as an exemption is tailored broadly enough that it reflects valid secular purposes.") (citation omitted). The RFRA reflected no purpose to promote a particular religious point of view.
 
 
 47
 The RFRA also satisfies the other two prongs of the Lemon test. Its principal effect neither advances nor inhibits religion within the meaning of Lemon. "For a law to have forbidden `effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence," rather than simply by granting an exemption to religious organizations. Amos, 483 U.S. at 337-38, 107 S.Ct. 2862 ("Where . . . government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities."). Although the RFRA certainly provides some benefit to religious organizations, "a law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose." Id. at 337, 107 S.Ct. 2862. Finally, there is no question that the RFRA decreases rather than fosters government entanglement with religion, as required by the third prong of Lemon. Amos, 483 U.S. at 339, 107 S.Ct. 2862 (An exemption "effectuates a more complete separation of [church and state] and avoids. . . intrusive inquiry into religious belief.").
 
 
 48
 We note in general that the Supreme Court approved of and invited legislative enactments of religious exceptions to neutral laws in Smith itself. 494 U.S. at 890, 110 S.Ct. 1595. The court pointed to state exceptions to drug laws for sacramental peyote use and noted with approval that "a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well." Id. ("[T]o say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required."). We therefore hold that the RFRA, as applicable to federal law, does not violate the Establishment Clause of the Constitution.
 
 
 49
 Having found the portions of the RFRA applicable to the federal government and federal law constitutional, we have little difficulty finding those portions severable from the RFRA's unconstitutional sections. A court must sever the invalid parts of a statute from the valid parts "unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." Chadha, 462 U.S. at 931-32, 103 S.Ct. 2764 (internal quotation marks, citations, and alterations omitted); Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("A court should refrain from invalidating more of the statute than is necessary.") (alteration omitted). We know of no evidence that Congress would not have applied the RFRA to the federal government unless it could also be applied to state and local governments. We therefore hold the portion of the RFRA applicable to the federal government severable from its unconstitutional portions. See Kikumura, 242 F.3d at 959-60 (finding federal portions of the RFRA severable); In re Young, 141 F.3d at 859 (same).
 
 CONCLUSION
 
 50
 The RFRA is an amendment to the ADEA and, as such, is constitutional. The parties have not briefed the issue of how it impacts the merits of this case. The district court did not apply the RFRA, relying instead on the "ministerial exception" to the ADEA. We believe that, while the RFRA's application is a matter of law, it would be appropriate to hear from the district court first, rather than seek yet further briefing in this court. We therefore vacate and remand for reconsideration under the RFRA standards.
 
 
 
 Notes:
 
 
 [1]
 Appellant initially moved for a preliminary injunction requiring appellees to restore his active status, but he withdrew the motion after the NYAC and Lyght appointed another clergy member to fill his vacant position
 
 
 [2]
 The district court did not address this issue, but because it raises purely legal questions, we do so hereSee McGinty v. New York, 251 F.3d 84, 90 (2d Cir.2001) (addressing question not decided by district court where facts were undisputed and legal question was briefed).
 
 
 [3]
 Section 2000e-5(f)(1) provides in pertinent part:
 If a charge filed with the Commission . . . is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action . . . or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge. . . .
 
 
 [4]
 No court appears to have addressed the issue squarely, but some suggestive caselaw exists. Some courts seem to have assumed without discussion that the RFRA may be asserted as a defense by a private party against another private partySee, e.g., Guinan v. Roman Catholic Archdiocese of Indianapolis, 42 F.Supp.2d 849, 853 (S.D.Ind. 1998) (permitting the private party defendant to assert a RFRA defense but rejecting it after first finding that the ministerial exception negated the need to discuss the RFRA defense); Urantia Found., v. Maaherra, 895 F.Supp. 1335, 1336-37 (D.Ariz.1995) (permitting the defendant to raise a RFRA defense but rejecting it because the defendant did not contest the constitutionality of the trademark and copyright laws in general or as applied to her). Bankruptcy courts have also generally permitted a private-party defendant to assert a RFRA defense against a Chapter 7 trustee. See Christians v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1407, 1418-19 (8th Cir.1996) (permitting a defendant to assert a RFRA defense and recover debtors' tithes to the church because "the government action in question meaningfully curtails, albeit retroactively, a religious practice"), vacated, 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), reaff'd, 141 F.3d 854 (8th Cir. 1998); see also In re Tessier, 190 B.R. 396 (Bankr.D.Mont.1995); Newman v. Midway Southern Baptist Church (In re Newman), 183 B.R. 239 (Bankr.D.Kan.1995), aff'd, 203 B.R. 468 (D.Kan.1996). A bankruptcy trustee is arguably "acting under color of law" and therefore falls within the RFRA's definition of "government." 42 U.S.C. § 2000bb-2(1). United States trustees are part of the executive branch and protect the interests of the United States in the liquidation. See 28 U.S.C. § 586(a); 11 U.S.C. §§ 701(a)(1), 703(b)-(c) and 704(9); In re Schoenewerk, 304 B.R. 59, 62-63 (Bankr.E.D.N.Y.2003).
 
 
 [5]
 The RFRA's stated purposes include "restor[ing] the compelling interest test as set forth inSherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)." 42 U.S.C. § 2000bb(b)(1). The Supreme Court noted that "Congress enacted RFRA in direct response to the Court's decision in" Smith. City of Boerne v. Flores, 521 U.S. 507, 512, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).
 
 
 [6]
 We find no principled constitutional distinction between Congress's ability to amend statutes on an individual basis and its power to do so in a wholesale manner through an enactment such as the RFRASee Guerrero, 290 F.3d at 1221 n. 18.
 
 
 [7]
 Appellant also argues thatBoerne explicitly invalidated all of the RFRA due to separation of powers concerns. Specifically, appellant relies upon the statement that the "RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance." Boerne, 521 U.S. at 536, 117 S.Ct. 2157. The argument is entirely unconvincing. The quoted language simply explained why Congress could not enact the RFRA pursuant to its Section 5 power. The quoted phrase reads in full as follows: "Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance." Id. This analysis has no application to any separation of powers concerns raised by the RFRA's enactment and application to the federal government under the Necessary and Proper Clause. See Guerrero, 290 F.3d at 1220 (Boerne's "discussion of the separation of powers doctrine was entirely within the framework of its section 5 analysis — not an independent rationale.").
 
 
 
 51
 SOTOMAYOR, Circuit Judge, dissenting.
 
 
 52
 The Religious Freedom and Restoration Act ("RFRA") is not relevant to this dispute. First, appellees have unambiguously indicated that they do not seek to raise a RFRA defense, and the statute's protections, even if otherwise applicable, are thus waived. Second, the statute does not apply to disputes between private parties. Third, we should affirm the judgment of the district court without reaching the RFRA issue on the ground that Supreme Court and Second Circuit precedent compels a finding that the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., does not govern disputes between a religious entity and its spiritual leaders. The majority's opinion thus violates a cardinal principle of judicial restraint by reaching unnecessarily the question of RFRA's constitutionality. For these reasons, I respectfully dissent.
 
 A.
 
 53
 Because the parties' original submissions to this Court mentioned RFRA without providing a detailed analysis of either the Act's constitutionality or its relevance to this case, we ordered supplemental briefing. The letter-briefs submitted in response to our order make clear that appellees have waived any RFRA defense.
 
 
 54
 In several portions of appellees' supplemental brief that the majority neglects to mention, appellees state plainly that they do not intend to raise a RFRA defense. Appellees' supplemental brief explains that "the reference to RFRA in Appellees' [original] brief was for the limited purpose of providing an example of how critically the question of `entanglement' was viewed" by Congress. In other words, appellees' aim was not to rely on the statute as a defense against appellant's claims, but merely to illustrate Congress's agreement with the proposition that "entanglement of the Government in church affairs [was] prohibited by the First Amendment." (emphasis added). In fact, appellees explicitly reject the application of RFRA to their claims because they believe that the statute does not apply to suits between private parties, and "the case at bar is a matter relating to a private employment situation and does not involve actions by the government." The letter-brief concludes: "We do not think this issue [RFRA] is determinative in the matters raised by this case." While the majority might find appellees' position unwise or "supris[ing]," Maj. Op. at 104, appellees' letter-brief clearly waives any RFRA defense.[1]
 
 
 55
 The majority does not contest that RFRA's protections are generally waivable. Maj. Op. at 104; see United States v. Amer, 110 F.3d 873, 879 n. 1 (2d Cir.1997); see also In re Watson, 403 F.3d 1, 7 (1st Cir.2005) (holding that RFRA argument was forfeited); Bethesda Lutheran Homes & Servs., Inc. v. Leean, 122 F.3d 443, 449 (7th Cir.1997) (holding that RFRA argument was waived); Cochran v. Morris, 73 F.3d 1310, 1317 n. 3 (4th Cir.1996) (holding that RFRA claim was waived). In the majority's view, however, because appellees' arguments relate to rights protected under RFRA — namely, First Amendment religious rights — appellees have "[i]n substance" relied on RFRA and thus have not, despite their explicit disclaimer, waived its protections. Maj. Op. at 104.
 
 
 56
 The majority's refusal to recognize appellees' waiver in this case is at odds with RFRA's text, which provides that individuals "may assert" a RFRA defense when challenging a substantial burden on their religious rights, not that they must assert a RFRA defense when religious rights are burdened. 42 U.S.C. § 2000bb-1(c) (emphasis added). Moreover, the majority's insistence on the viability of a RFRA defense despite appellees' waiver leads the Court to assess RFRA's constitutionality unnecessarily. See Cutter v. Wilkinson, 544 U.S. 709, ___ n. 2, 125 S.Ct. 2113, 2118 n. 2, 161 L.Ed.2d 1020 (2005) (noting that the Supreme Court has "not had occasion to rule" whether RFRA "remains operative as to the Federal Government"); see also City of Boerne v. Flores, 521 U.S. 507, 532-36, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (invalidating RFRA as applied to state law). By going out of its way to reach this constitutional question, the majority violates one of the "cardinal rules governing the federal courts," namely, "never to anticipate a question of constitutional law in advance of the necessity of deciding it." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (citation and internal quotation marks omitted).[2]
 
 
 57
 The majority's approach is also inconsistent with our case law, which has recognized waiver of statutory religious rights even where a litigant raises claims under the Free Exercise Clause. In Fifth Avenue Presbyterian Church v. City of New York, 293 F.3d 570 (2d Cir.2002), for example, the plaintiff argued before this Court that its religious rights had been violated under both the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA) — a statute virtually identical to RFRA in all aspects relevant to the issue of waiver in the instant case.[3] Although we ruled on the merits of the plaintiff's Free Exercise claim in Fifth Avenue Presbyterian Church, we refused to reach the RLUIPA issue because the plaintiff had raised it for the first time on appeal. See id. at 576. It is impossible to square our refusal to consider plaintiff's belated RLUIPA claim in Fifth Avenue Presbyterian Church with our refusal to recognize the defendant's voluntary waiver of a RFRA defense in the instant case. There is no meaningful difference between RFRA and RLUIPA that could justify such inconsistent results.
 
 
 58
 The most troublesome aspect of the majority's ruling on waiver, however, is that it fundamentally misconstrues the nature of RFRA and First Amendment rights, and, in doing so, directly contradicts Supreme Court precedent. The majority holds that because appellees invoke the First-Amendment-based "ministerial exception" and allege interference with their rights under the Free Exercise and Establishment Clauses, they have effectively "ask[ed] us to apply the RFRA, but not to mention it." Maj. Op. at 104. This is incorrect. RFRA and the First Amendment do not provide identical protections, and the invocation of First Amendment rights — whether under the Free Exercise or the Establishment Clause — does not necessarily implicate RFRA.
 
 
 59
 As interpreted by the Supreme Court, for example, the Free Exercise Clause does not normally "inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct," Cutter, 125 S.Ct. at 2118 (citing Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 878-82, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)), such as the ADEA. RFRA, in contrast, requires strict scrutiny of such laws where the incidental burden on religion is substantial. See 42 U.S.C. § 2000bb-1. Indeed, the fact that RFRA's protections sweep more broadly than those of the Free Exercise Clause provided the principal basis for the Supreme Court's holding in City of Boerne v. Flores that RFRA could not be considered "preventive" or "remedial" legislation under Section Five of the Fourteenth Amendment. 521 U.S. at 532, 117 S.Ct. 2157. The Court found RFRA's protections "so out of proportion to a supposed remedial or preventive object that [the statute] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. Because RFRA went so far beyond what the First Amendment required, the Boerne Court understood the statute as "attempt[ing] a substantive change in constitutional protections" — a change that Congress was not authorized to make. Id. Although Boerne does not resolve the issue of RFRA's constitutionality as applied to federal law, as opposed to state law,[4] the case does firmly establish that RFRA and the Free Exercise Clause create different standards for the protection of religion and that RFRA's substantive protections extend far beyond what the Free Exercise Clause requires. Thus, the majority's suggestion that a claim alleging unconstitutional interference with the free exercise of religion is "[i]n substance" a RFRA claim flies in the face of Boerne.[5] See also Kaufman v. McCaughtry, 419 F.3d 678, 681 (7th Cir.2005) (noting that RFRA provides protections beyond those guaranteed by the First Amendment); Brzonkala v. Va. Polytech. Inst. & State Univ., 169 F.3d 820, 881-82 (4th Cir.1999) ("The [RFRA] created a right of religious exercise that was more generous than that right protected by the Constitution . . . ."), aff'd sub nom. United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).
 
 
 60
 Nor can the majority plausibly argue that appellees' Establishment Clause defense necessarily implicates RFRA. To satisfy the Establishment Clause: (1) the statute must have "a secular legislative purpose"; (2) the statute's "principal or primary effect must be one that neither advances nor inhibits religion"; and (3) "the statute must not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (citation and internal quotation marks omitted). Thus, like the Free Exercise Clause, the Establishment Clause imposes less stringent requirements on federal statutes than RFRA, which mandates strict scrutiny even of neutral, generally applicable laws that incidentally impose substantial burdens on religion.[6] Furthermore, Congress made clear in enacting RFRA that the statute was not intended to have any effect on Establishment Clause claims. See 42 U.S.C. § 2000bb-4 ("Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion.").
 
 
 61
 The majority's assertion that appellees have presented a RFRA defense in "all but name" would be more plausible if something in appellees' briefs indicated that they sought protection beyond that which the Constitution guarantees. Nothing in the briefs, however, supports such a conclusion. Appellees' briefs rely heavily on the Free Exercise Clause, the Establishment Clause, and case law interpreting those provisions. Nowhere do they ask that the Court apply a standard stricter than what the First Amendment requires.[7] On the contrary, appellees' supplemental brief explicitly disclaims any intent to rely on RFRA.
 
 
 62
 In sum, because appellees' religious freedom argument relies only on the Free Exercise and Establishment Clauses, and because the substance of the protections afforded by these constitutional provisions differs considerably from the protections afforded by RFRA, as interpreted by the Supreme Court, I cannot agree with the majority's conclusion that appellees have "[i]n substance" relied on RFRA. Maj. Op. at 104.
 
 
 63
 The majority's refusal to recognize appellees' clear waiver of any RFRA defense appears to rest, in part, on its disagreement with the reasons underlying appellees' decision not to pursue such a defense. Specifically, the majority takes issue with appellees' conclusion that RFRA does not apply to suits between private parties. See Maj. Op. at 104-105. I am unaware of any other case in which this Court, after ordering supplemental briefing to allow a party to discuss a waivable statutory defense, refused to recognize the party's subsequent waiver of that defense on the ground that the Court disagreed with counsel's reasons for declining to rely on the statute. Cf. DeLuca v. Lord, 77 F.3d 578, 588 (2d Cir.1996) (observing that where defense counsel in a criminal case has made "a considered decision, after investigation, not to pursue" a particular defense, this Court should be "extremely reluctant to second-guess that decision"). Even if such second-guessing of a party's decision not to pursue a particular defense is appropriate in certain limited circumstances, the majority's refusal to acknowledge the clear waiver in this case is improper, given that appellees are adequately represented by counsel and based their waiver on a reasonable interpretation of the law. Indeed, the majority concedes that it is unable to find a single holding that contradicts appellees' view that RFRA does not apply to suits between private parties. See Maj. Op. at 103 n. 4.
 
 
 64
 Quoting the Supreme Court, the majority argues that "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Maj. Op. at 104-105 (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)). This certainly is true, but it only begs the question of whether the "issue or claim is properly before the court." Id. Given appellees' clear indication that they do not seek to rely on RFRA, the applicability of that statute is not before us. The majority's disagreement with appellees' reasoning does not change that fact.
 
 B.
 
 65
 Even assuming, arguendo, that appellees' clear disclaimer of any RFRA defense does not suffice to waive such a defense, I would find it improper to remand the case to the district court for consideration of RFRA's implications because I disagree with the majority's conclusion regarding RFRA's applicability. RFRA by its terms does not apply to suits between private parties.
 
 
 66
 Two provisions of the statute implicitly limit its application to disputes in which the government is a party. Section 2000bb-1(c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government" (emphasis added). In the majority's view, we should read this provision as "broadening, rather than narrowing, the rights of a party asserting the RFRA." Maj. Op. at 103. This interpretation would be questionable even if Section 2000bb-1(c) were the only provision of the statute affecting the question of whether RFRA applies to private suits. When read in conjunction with the rest of the statute, however, it becomes clear that this section reflects Congress's understanding that RFRA claims and defenses would be raised only against the government. For instance, section 2000bb-1(b) of RFRA provides that where a law imposes a substantial burden on religion, the "government" must "demonstrate[] . . . that application of the burden" is the least restrictive means of furthering a compelling governmental interest (emphasis added). The statute defines "demonstrate" as "meet[ing] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). Where, as here, the government is not a party, it cannot "go[] forward" with any evidence.[8] In my view, this provision strongly suggests that Congress did not intend RFRA to apply in suits between private parties.[9]
 
 
 67
 I recognize that according to RFRA's "applicability" section, the statute applies "to all Federal law." 42 U.S.C. § 2000bb-3. This provision, however, is not inconsistent with a finding that the statute does not apply to suits between private parties. Read in conjunction with the rest of the statute, the provision simply requires courts to apply RFRA "to all Federal law" in any lawsuit to which the government is a party.
 
 
 68
 The majority objects that this interpretation makes RFRA's protections improperly dependent on whether a private party, as opposed to the EEOC, brings suit under the ADEA. "[T]he substance of the ADEA's prohibitions," the majority argues, "cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." Maj. Op. at 103. The majority does not explain, however, why this is so. If RFRA amends all federal statutes as they apply to suits in which the government is a party, then the substance of the ADEA's prohibitions most certainly can change depending on who enforces it. Although the majority evidently finds this unsatisfactory from a policy perspective, there is no acceptable reading of the statute that would yield the kind of consistency the majority desires.
 
 
 69
 Finally, as noted above, the majority concedes that it is unable to locate a single court holding that directly supports its novel application of RFRA to a suit between private parties. See Maj. Op. at 103 n. 4.[10] This is telling, for Congress enacted RFRA over twelve years ago. The plain language of the statute, its legislative history, and its interpretation by courts over the past twelve years demonstrate that RFRA does not apply to suits between private parties.
 
 C.
 
 70
 Even if appellees had not waived the RFRA defense, and even if RFRA applied to suits between private parties, I would still find it unnecessary to reach the RFRA issue, or to analyze the statute's constitutionality, because Supreme Court and Second Circuit precedent compel the conclusion that the ADEA does not apply to this dispute. Because the ADEA does not apply, there is no "substantial burden" on religion, and RFRA, even if constitutional, is irrelevant.
 
 
 71
 In analyzing the ADEA's applicability to this case, we find guidance in the principles articulated by the Supreme Court in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). To determine whether the National Labor Relations Act (NLRA) authorized the National Labor Relations Board to regulate labor relations between a parochial school and its faculty, the Catholic Bishop Court considered two principal questions. See id. at 501, 99 S.Ct. 1313. First, it considered whether this application of the NLRA raised First Amendment concerns. The Court concluded that it did, explaining that judicial oversight of labor relations at a parochial school would risk excessive entanglement between secular and religious authorities in violation of the Establishment Clause. Id. at 501-04, 99 S.Ct. 1313. Second, the Court examined whether Congress expressed an intention to apply the statute to religious institutions despite these constitutional concerns. Because the Court discerned no such congressional intent, it construed the NLRA in a manner that avoided the constitutional difficulty, holding that the statute did not apply to labor disputes between parochial schools and their employees.[11] Id. at 504-07, 99 S.Ct. 1313; see id. at 500, 99 S.Ct. 1313 (citing the longstanding principle that acts of Congress "ought not be construed to violate the Constitution if any other possible construction remains available") (citing Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804)); see also Hsu By & Through Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839, 854 (2d Cir.1996) (noting this Court's "consistent . . . practice of avoiding constitutional questions where possible").
 
 
 72
 Distinguishing Catholic Bishop, we concluded in DeMarco v. Holy Cross High Sch., 4 F.3d 166 (2d Cir.1993), that the ADEA, unlike the NRLA, generally applies to religious institutions. Id. at 172. Specifically, we held that a former lay teacher could bring an ADEA action against a parochial school even though the teacher performed some religious duties. Id. at 168-72. In so holding, we observed that the ADEA, unlike the NRLA, does not pose the risk of "extensive or continuous administrative or judicial intrusion into the functions of religious institutions." Id. at 170. Instead, the ADEA involves "`routine regulatory interaction'" and requires "`no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring [or] close administrative contact between secular and religious bodies.'" Id. at 170 (quoting Hernandez v. Comm'r, 490 U.S. 680, 696-97, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (internal quotation marks omitted)); see also id. ("In age discrimination cases, the EEOC's authority extends only to the investigation and attempted conciliation or resolution of individual or group complaints; it is limited in time and scope." (citation and internal quotation marks omitted)). These factors distinguished the ADEA from the NLRA.[12]
 
 
 73
 As a general rule, federal courts may decide civil disputes, including employment discrimination disputes, between a religious institution and its employees without violating the First Amendment. See Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc., 312 F.3d 94, 99-100 (2d Cir.2002) (citing Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 431 (2d Cir.1999)); Gargano v. Diocese of Rockville Ctr., 80 F.3d 87, 90 (2d Cir.1996); DeMarco, 4 F.3d at 172; cf. Employment Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes)." (internal quotation marks omitted)). The instant case, however, presents the more difficult question of whether this general rule applies in the narrow context of a forced-retirement dispute between a religious body and a member of its clergy.
 
 
 74
 As we noted in DeMarco, the relationship between a religious institution and certain of its employees may be "so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause." Id. at 172. This risk is particularly serious in employment disputes between religious institutions and their spiritual leaders where the enforcement of statutes like the ADEA might threaten the "power of religious bodies to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich, 426 U.S. 696, 722, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (internal quotation marks and alteration omitted). "A church's selection of its own clergy" is a "core matter of ecclesiastical self-governance" at the "heart" of the church's religious mission. Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 946 (9th Cir.1999). Federal court entanglement in matters as fundamental as a religious institution's selection or dismissal of its spiritual leaders risks an unconstitutional "trespass[] on the most spiritually intimate grounds of a religious community's existence." EEOC v. Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795, 800 (4th Cir.2000).
 
 
 75
 In light of these serious constitutional concerns, we must ask whether Congress intended to apply the ADEA to religious institutions in their selection of spiritual leaders. See Catholic Bishop, 440 U.S. at 504, 99 S.Ct. 1313. We concluded in DeMarco that Congress "implicitly expressed an intention to apply the ADEA to religious institutions." 4 F.3d at 172. We based this conclusion, in part, on the ADEA's similarity to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. "Given that Congress intended to apply Title VII to religious institutions, and that Congress modelled the ADEA's coverage upon that of Title VII," we were "convinced that [Congress] also intended to apply the ADEA to such institutions." Id. at 173.
 
 
 76
 DeMarco, however, involved an employment dispute between a religious institution and a math teacher who, despite having some religious duties, served primarily non-religious functions in a parochial school. Here, in contrast, the dispute is between a minister with primarily religious duties and a church that no longer wishes him to serve as pastor of a congregation. That Congress intended the ADEA and Title VII to apply under the circumstances described in DeMarco does not indicate an intention that those statutes should apply in all circumstances. Nothing in the text, structure, or legislative history of the ADEA indicates an intention to extend its provisions to a religious body's selection or dismissal of its ministers. See Catholic Bishop, 440 U.S. at 504, 99 S.Ct. 1313; DeMarco, 4 F.3d at 169, 172-73. Accordingly, I believe that the ADEA does not apply to the case at bar.[13] Because the ADEA does not apply, there is no substantial burden on religion that could trigger RFRA.
 
 
 77
 The majority suggests that reliance on Catholic Bishop (and DeMarco) is unwarranted, because "RFRA [is] the full expression of Congress's intent with regard to the religion-related issues before us and displace[s] earlier judge-made doctrines that might have been used to ameliorate the ADEA's impact on religious organizations and activities." Maj. Op. at 102. Even if RFRA applied to private suits and had not been waived in this case, I would disagree with the majority's suggestion that the statute completely displaces the Catholic Bishop analysis. Although the Catholic Bishop rule and RFRA serve similar purposes, they require courts to undertake different inquiries. See Univ. of Great Falls v. NLRB, 278 F.3d 1335, 1347 (D.C.Cir.2002) (holding that the court need not address a university's RFRA argument because the university was entitled to an exemption under Catholic Bishop, and observing that "RFRA presents a separate inquiry from Catholic Bishop"). Catholic Bishop requires courts, where possible, to interpret statutes in ways that would avoid raising serious constitutional concerns. In some cases, no such interpretation will be reasonably available. In those cases, RFRA may provide an independent avenue both for protecting religious rights and for avoiding definitive resolution of constitutional questions. Thus, RFRA should not be read to supplant the Catholic Bishop inquiry, but to supplement it. Indeed, given that RFRA's express purpose was to enhance protection for religion, see 42 U.S.C. § 2000bb, it makes little sense to read the statute as eliminating the protection afforded by the Catholic Bishop rule.
 
 D.
 
 78
 I believe that a remand is a wasteful expenditure of judicial resources and an unnecessary and uninvited burden on the parties. The district court is in no better position than we are to decide either the statutory or constitutional questions presented in this case. In my view, the most appropriate disposition of this case would be to affirm the district court's dismissal of appellant's claims on the ground that the ADEA does not apply to employment suits brought against religious institutions by their spiritual leaders. Because the majority's contrary approach disregards a clear and voluntary waiver, conflicts with RFRA's text and with binding precedent, and unnecessarily resolves a contested constitutional question, I respectfully dissent.[14]
 
 
 
 Notes:
 
 
 [1]
 In addition to ignoring most of the language in the appellees' brief relating to waiver, the majority opinion makes two factually erroneous claims regarding the content of the supplemental letter-briefs. First, the majority writes that "appellant argues that the RFRA is inapplicable only because it is unconstitutional." Maj. Op. at 104. On the contrary, appellant argues also that RFPA is inapplicable because "[t]here is no substantial burden to the free exercise of religion that could result from a ruling by this court" that appellees violated the ADEA. The majority also contends that "[t]he parties have not briefed the issue of how [RFRA] impacts the merits of this case." Maj. Op. at 109. Both parties, however, have addressed the question of RFRA's relevance to this suit. Appellant argues that RFRA is inapplicable because "[t]here is no substantial burden to the free exercise of religion" in this case, and that, in any event, "application of RFRA to federal law is unconstitutional." Appellees, in turn, argue that RFRA is constitutional but should not affect the outcome of this case
 
 
 [2]
 The other "cardinal rule[]" cited inBrockett is that federal courts should "never . . . formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." 472 U.S. at 501, 105 S.Ct. 2794 (citation and internal quotation marks omitted).
 
 
 [3]
 Like RFPA, RLUIPA prohibits the government from imposing substantial burdens on religion even where the burden results from a neutral law of general applicabilitySee 42 U.S.C. § 2000cc. RLUIPA's remedial provision is virtually identical to RFRA'S. Compare 42 U.S.C. § 2000cc-2(a) ("A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."), with 42 U.S.C. § 2000bb-1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). RLUIPA is simultaneously more broad and more narrow than RFRA, however. RLUIPA is more broad because it still reaches state law. See Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). It is more narrow because it applies only to certain government actions involving land use regulations and correctional facilities. See 42 U.S.C. §§ 2000cc, 2000cc-1.
 
 
 [4]
 I express no view on whether RFRA is constitutional as applied to federal law because it is unnecessary for us to reach this question
 
 
 [5]
 BeforeBoerne, a reasonable argument could have been made that all Free Exercise Clause claims required scrutiny under RFRA. The Tenth Circuit, for example, held in Werer v. McCotter, 49 F.3d 1476 (10th Cir. 1995), that RFRA applied to all Free Exercise claims, even where the parties had not raised a claim or defense under the statute. In a subsequent en banc opinion, however, the Tenth Circuit recognized that Boerne had undermined its earlier conclusion:
 [I]n Werner, decided prior to City of Boerne, we were laboring under the false understanding that RFRA "legislatively overturned a number of recent Supreme Court [free exercise] decisions" and that it created a new rule of constitutional law. Thus, we concluded that because the language of RFRA made it applicable to "all cases where free exercise of religion is substantially burdened," its standard ought to control a Free Exercise Clause claim even when not raised. Because the Supreme Court has made clear that the Werner court's assumptions about RFRA were faulty, its rationale is no longer convincing.
 United States v. Hardman, 297 F.3d 1116, 1125 n. 15 (10th Cir.2002) (en banc) (alteration in original) (citations omitted).
 
 
 [6]
 As recently emphasized by a plurality of Justices, the Supreme Court has not applied the Lemon test with much consistencySee Van Orden v. Perry, ___ U.S. ___, 125 S.Ct. 2854, 2860-61, 162 L.Ed.2d 607 (2005) (plurality opinion). I am unaware of any application of the Establishment Clause, however, that would invalidate a neutral, generally applicable law imposing an incidental but substantial burden on religion.
 
 
 [7]
 The closest appellees come to making a RFRA argument, as opposed to a First Amendment argument, is a statement in their original brief that application of the ADEA would "substantially burden the free exercise rights of the United Methodist Church." This is the only occasion, however, in which appellees employ RFRA-like language by referring to the alleged intrusion on their rights as a "substantial[] burden," and it is clear from context that the statement formed part of appellees' Establishment Clause argument that application of the ADEA would foster an excessive entanglement with religion. The brief did not purport to raise a separate defense under RFRA. In any event, even if appellees' mention of a "substantial[] burden" in their original brief could be generously construed as an attempt to present a RFRA defense, appellees' subsequent letter-brief makes clear that this was not their intent and that they do not seek to invoke RFRA's protections
 
 
 [8]
 There are two plausible ways to reconcile section 2000bb-1(b) of RFRA with the majority opinion in this case. The first would be to require government intervention in every private suit where one of the parties asserts that a law has — even incidentally — imposed a substantial burden on religious freedom. Absent clear statement that Congress intended such result, it is not the role of this Court to mandate such widespread and automatic federal intervention in lawsuits between private parties. Moreover, were we to read the statute to require government intervention, this would surely underscore the wisdom in recognizing appellees' explicit waiver of any RFRA defense. The second would be to force private parties to bear the burden RFRA places on the government. The statute gives no indication that Congress intended private parties to bear such a burden, nor would it be appropriate to require private parties to satisfy the stringent burden RFRA places on the government
 
 
 [9]
 All of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a partySee S. Rep. No. 103-111 (1993); H.R. Rep. 103-88 (1993). The lack Of even a single example of a RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties.
 
 
 [10]
 The majority cites dicta from district court opinions in Indiana and Arizona but concedes that those courts "assumed" that RFRA could apply without analyzing the issue in any depthSee Maj. Op. at 103 n. 4.
 
 
 [11]
 The Court reached this conclusion even though the NLRA did not expressly include religious institutions in its list of eight types of employers exempted from the actSee Catholic Bishop, 440 U.S. at 511, 99 S.Ct. 1313 (Brennan, J., dissenting) (citing 29 U.S.C. § 152(2)).
 
 
 [12]
 As discussed below,DeMarco also found the ADEA distinguishable from the NLRA because Congress clearly intended the ADEA to apply to religious institutions. See 4 F.3d at 172.
 
 
 [13]
 This conclusion is consistent with the holdings of at least seven of our sister Circuits, which have adopted a limited "ministerial exception" that exempts religious institutions on First Amendment grounds from employment discrimination suits brought by clergy members or other employees serving primarily religious rolesSee Roman Catholic Diocese of Raleigh, N.C., 213 F.3d at 800, 805; Gellington v. Christian Methodist Episcopal Church, Inc., 203 F.3d 1299, 1304 (11th Cir. 2000); Bollard, 196 F.3d at 949; Combs v. Central Tex. Annual Conf of the United Methodist Church, 173 F.3d 343, 351 (5th Cir. 1999); EEOC v. Catholic Univ. of Am., 83 F.3d 455, 463 (D.C.Cir.1996); Young v. N. Ill. Conf of United Methodist Church, 21 F.3d 184, 187 (7th Cir.1994); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir.1991). Most circuits have reached the constitutional question directly and have held that the First Amendment bars adjudication of ministerial employment disputes. See, e.g., Gellington, 203 F.3d at 1304; Combs, 173 F.3d at 351; Young, 21 F.3d at 187. Here, in contrast, I would apply Catholic Bishop's principles of statutory construction so as to avoid making definitive pronouncements on the constitutional question. See 440 U.S. at 507, 99 S.Ct. 1313; see also Scharon, 929 F.2d at 361-63 (applying the Catholic Bishop analysis to an employment discrimination action brought by a priest). Despite this difference, my conclusion is substantially the same as that of other Circuits: courts may not adjudicate employment discrimination lawsuits brought by clergy members challenging a religious body's refusal to select or retain them as spiritual leaders.
 
 
 [14]
 I take no issue, however, with the analysis of the ADEA's procedural requirements in section (a) of the majority's opinionSee Maj. Op. at 100-102.