*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

GENERAL CONFERENCE CORPORATION OF
SEVENTH-DAY ADVENTISTS and GENERAL
CONFERENCE OF SEVENTH-DAY ADVENTISTS,
an Unincorporated Association,
                    *Plaintiffs-Appellees,*

          *v.*

WALTER MCGILL, d/b/a CREATION 7TH DAY
ADVENTIST CHURCH et al.,
                    *Defendant-Appellant.*

No. 09-5723

_____

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 06-01207—J. Daniel Breen, District Judge.

Argued: March 11, 2010

Decided and Filed: August 10, 2010

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles L. Holliday, SPRAGINS, BARNETT & COBB, PLC, Jackson, Tennessee, for Appellant. Joel T. Galanter, ADAMS AND REESE LLP, Nashville, Tennessee, for Appellees. **ON BRIEF:** Charles L. Holliday, SPRAGINS, BARNETT & COBB, PLC, Jackson, Tennessee, for Appellant. Joel T. Galanter, ADAMS AND REESE LLP, Nashville, Tennessee, Emily C. Taube, ADAMS AND REESE LLP, Memphis, Tennessee, for Appellees.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiffs General Conference Corporation of Seventh-day Adventists ("General Conference Corporation") and General Conference of Seventh-day Adventists ("General Conference") sued Walter McGill for

trademark infringement based on McGill's use of their protected marks in advertising and promoting his breakaway church. McGill brought a motion to dismiss based on the Free Exercise Clause and the Religious Freedom Restoration Act ("RFRA"), which the district court denied. The district court later granted partial summary judgment for the plaintiffs. After McGill's repeated refusal to appear for a court-ordered mediation to which he had initially consented, the district court entered default judgment against him. He now appeals. For the reasons discussed below, we **AFFIRM**.

## I. BACKGROUND

The district court discussed the relevant background of the litigation:

> General Conference Corporation of Seventh-day Adventists . . . is a corporation whose principal place of business is located in Maryland. ([Docket Entry ("D.E.")] No. 37, Pls.' Statement of Undisputed Facts ¶ 9.) The other Plaintiff, General Conference of Seventh-day Adventists . . . is an unincorporated association that represents the interests of the Seventh-day Adventist Church. (*Id.* ¶ 10.) The General Conference was formed in 1863, marking the official organization of the Seventh-day Adventist Church. (D.E. No. 21, George W. Reid ThD's Expert Report ¶ 13.) The church grew out of several congregations that believed that Christ's Second Advent was imminent and that the Sabbath should be observed on the seventh day of the week. (*Id.* ¶ 1.) The Plaintiffs' expert, George Reid ThD, asserts that none of these early churches called themselves "Seventh-day Adventist" and that it was not until the congregations came together to create a formal church structure that the name "Seventh-day Adventist" was chosen. (*Id.* ¶¶ 8-10.) Since the official formation of the church, the names "Seventh-day Adventist" and "SDA" have been used by the Seventh-day Adventist Church as the church's name, and as its trade name in advertising and publishing. (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶ 40.) The church today has approximately 968,604 members in the United States, as well as 3,529 ministers and 5,316 congregations. (*Id.* ¶ 44.) Worldwide, it has over fourteen million members, 16,892 ministers, and 121,625 congregations. (*Id.*)
> The Corporation holds title to all of the church's assets. (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶ 11.) It has registered the marks "Seventh-day Adventist," "Adventist," and "General Conference of Seventh-day Adventists," with the United States Patent and Trademark Office. (*Id.* ¶¶ 17-23.) Registration number 1,177,185 protects the use of the "Seventh-day Adventist" mark on religious books, magazines, pamphlets, newsletters, brochures, encyclopedias, dictionaries, commentaries, fliers, bulletins, yearbooks, booklets, and bibles. (*Id.* ¶ 25.) It also protects its use for the establishment and administration of employee health care and benefit programs and medical insurance programs, as well

as educational instruction services at the grade school, high school, and college level, and for film production and distribution services, health care services, and religious observances and missionary services. (*Id.*) Registration numbers 1,176,153 and 1,218,657 protect[] the "Advent[ist]" mark for the same purposes. (*Id.* ¶¶ 26-27.) Registration number 1,171,760 protects the "General Conference of Seventh-day Adventists" mark for church services. (*Id.* ¶ 28.)[1] "SDA" is an acronym for "Seventh-day Adventist" that has not been registered. (*Id.* ¶ 36.) The Plaintiffs assert that they are "legally equivalent terms," however, and that "SDA" has been used by the General Conference from 1863 onwards "as part of the corporate name, the trade name, in advertising, in publishing and publications, and in the performance of services." (*Id.* ¶¶ 40-41.)

The Defendant is the pastor of a church he currently calls "A Creation Seventh Day & Adventist Church," (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 5), although in his Answer to the Complaint he referred to it as the "Creation Seventh Day Adventist Church," (D.E. No. 4, Answer, at 1). His church has three members. (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 7.) There is a second three-member church associated with his, which has the same name and is located in British Columbia, Canada. (*Id.* at 8-9.) In addition, there are other congregations that the Defendant "raised up" in the United States, which have been apostatized, or diverted from the faith. (*Id.* at 9.)

McGill was originally baptized in a Seventh Day Adventist church affiliated with the Plaintiffs. (*Id.* at 16.) After several years, however, the Defendant decided to separate from the church because of a theological dispute. (*Id.* at 18.) In 1990, McGill formed his current church, taking its name from a divine revelation. (*Id.* at 34, 37.) While the Defendant was aware that the Plaintiffs had trademarked the name "Seventh Day Adventist," he used it anyway, because he believed that he was divinely mandated to do so. (*Id.* at 40.) McGill has also created the following internet domain names, among others: "7th-day-adventist.org," "creation-7th-day adventist-church.org," "creationseventhday-adventistchurch.org," "creationsda.org," and "csda.us." (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶¶ 13-14.) The Plaintiffs have not granted him any licenses to use their marks. (*Id.* ¶ 33.)

*Gen. Conference Corp. of Seventh-day Adventists v. McGill*, 624 F. Supp. 2d 883, 888–90 (W.D. Tenn. 2008).

---

[1]The plaintiffs do not allege that McGill infringed the trademark for "General Conference of Seventh-day Adventists."

On September 22, 2006, the plaintiffs filed a complaint in federal district court alleging trademark infringement, unfair competition, and dilution of marks under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), 1125(c); cybersquatting under 15 U.S.C. § 1125(d)(1); unfair and deceptive trade practices under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101; common law trademark infringement and unfair competition; and injury to business reputation and dilution of marks under Tenn. Code Ann. § 47-25-513. McGill filed an answer on October 17, 2006, raising as affirmative defenses the First Amendment, the Commerce Clause, laches, fair use, failure to state a claim, the fact that the trademarked terms are generic and that his use of similar terms do not cause confusion, and the assertion that the plaintiffs had lost their right to trademark protection "by deviation of doctrine from the religion of Seventh Day Adventism as it was originally formed." Answer ¶¶ 71–78 (Dist. Ct. Dkt. Doc. 4).

On September 26, 2007, McGill filed a motion to dismiss. Therein, he argued that the court lacked subject matter jurisdiction because it could not decide the intellectual-property issue without resolving an underlying dispute over religious doctrine. He also argued that the plaintiffs had failed to state a claim because RFRA renders trademark law inapplicable to him and because "Seventh-Day Adventism" is a religion and thus inherently generic and incapable of being trademarked. The district court denied the motion in full on May 5, 2008. It held that trademark law was applicable despite the Free Exercise Clause, that McGill had waived the RFRA defense by failing to raise it in his answer, and that whether the trademarked terms are generic is a factual issue that could not be resolved on a motion to dismiss.

On October 31, 2007, the plaintiffs moved for summary judgment. On June 11, 2008, the district court granted the motion in part and denied it in part. The court determined that the trademarks for "Seventh-day Adventist" and "Adventist" had become "incontestable" under 15 U.S.C. § 1065, meaning that they are presumptively valid and that McGill had the burden of showing otherwise. The court concluded that McGill could not overcome the presumption as to "Seventh-day Adventist," but that there was a genuine issue of material fact as to the genericness of "Adventist." The court

further found that the plaintiffs bore the burden of establishing the validity of their "SDA" mark but were not entitled to summary judgment on this point. The court then found that the plaintiffs had established that McGill's use of their marks was likely to cause confusion among the relevant audience. Finally, the district court rejected all the defenses that McGill raised in his answer. In sum, the district court granted the plaintiffs summary judgment on their infringement claims with respect to "Seventh-day Adventist" but denied it with respect to "Adventist" and "SDA."

During a May 30, 2008 telephone status conference, the parties agreed to mediate. The district judge referred the case to a magistrate judge, who on June 3, 2008 (a week before the summary-judgment order issued) scheduled the mediation for July 15, 2008. Shortly before that date, McGill's lawyer indicated that McGill would not attend the mediation. On July 24, 2008, McGill's lawyer filed a motion to amend the pretrial order to remove the mediation requirement because McGill's "religious convictions will not allow him to compromise his faith." Mot. to Amend at 2 (Doc. 71). That same day, McGill's lawyer moved to withdraw. The district court granted the motion to withdraw and denied McGill's motion to amend, ordering the parties to reset the mediation and warning that failure to attend could result in dismissal or default judgment. The parties conferred with the magistrate judge's office. New counsel for McGill indicated that McGill would not attend or allow counsel to attend. The plaintiffs requested a status conference, which was held on August 26, 2008. The district court again ordered the parties to schedule mediation and to certify to the court that they would attend. The parties scheduled the mediation for October 2, 2008. On September 4, 2008, the plaintiffs filed a certification expressing their intent to attend the conference, and defense counsel filed a certification indicating that McGill would *not* attend. The magistrate judge cancelled the mediation, and the plaintiffs moved for default judgment due to McGill's repeated violation of the court's order. On May 28, 2009, the district judge granted the motion. *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, No. 06-cv-1207, 2009 WL 1505738 (W.D. Tenn. May 28, 2009).

McGill then filed a notice of appeal and a motion to stay the district court's injunction against his continued use of the marks in his promotional materials. The district court denied McGill's motion to stay and entered judgment.

## II.  ANALYSIS

McGill appeals the denial of his motion to dismiss, the grant of partial summary judgment to the plaintiffs, and the entry of default judgment against him. As the plaintiffs point out, although McGill appealed the default-judgment order, he did not present argument regarding that order in his brief and has thus waived any argument that the order should not have been entered. *See Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005). The failure to challenge the default-judgment order, however, does not end our inquiry. A default judgment does not preclude review of whether the allegations in the complaint, if taken as true, "were sufficient to state a claim and support a judgment of liability." *United States v. Conces*, 507 F.3d 1028, 1038–39 (6th Cir. 2007); *see also Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1079–80 (6th Cir. 1990). Furthermore, it is not clear that the default-judgment order superseded the summary-judgment order. Thus, we review the district court's denial of McGill's motion to dismiss and its partial grant of the plaintiffs' motion for summary judgment. In both cases, our review is de novo. *Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792 (6th Cir. 2004); *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).

In challenging those orders, McGill makes four arguments: (1) the district court lacked subject-matter jurisdiction; (2) the district court should have dismissed the case or denied summary judgment under RFRA; (3) Seventh-day Adventism is a religion and thus not eligible for trademark protection as a matter of law; and (4) there were genuine issues of material fact regarding whether the marks were generic and concerning the likelihood of confusion caused by McGill's use of the marks.

**A. Subject-Matter Jurisdiction**

McGill argues that the First Amendment precluded the district court from exercising jurisdiction because the district court could not apply neutral principles of trademark law without resolving an underlying doctrinal dispute: to wit, who are the "true" Seventh-day Adventists. He argues in the alternative that we should create a prudential exception of sorts to relinquish jurisdiction in cases like the one at bar.

As this case involves the enforceability of intellectual-property rights, it makes sense to consider the Supreme Court's precedents in the area of church property disputes. *See Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1246–48 (9th Cir. 1999). The Supreme Court has recognized that "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1960). But the Court has also held that courts may apply "neutral principles of law" to resolve church property disputes. *Jones v. Wolf*, 443 U.S. 595, 604 (1979); *Md. & Va. Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 367–68 (1970). Unlike in *Presbyterian Church*, in which property rights turned on whether a church had abandoned the tenets of the faith, this case does not require us to decide any issue of church doctrine. Both the plaintiffs and McGill believe that the second coming of Christ is imminent and that the Sabbath should be celebrated on Saturday. Their dispute concerns whether McGill can use the plaintiffs' marks to promote his church's services and materials. Plainly, the case can be resolved using the neutral principles of trademark law.

The Ninth Circuit case *Maktab* is instructive. That case concerned a Sufi order in which property rights, including the right to use certain trademarked names and symbols, were passed from one spiritual leader, known as the Teacher, to the next. The order had splintered, and the two resulting sects disputed which was the true successor to the last Teacher. The district court held that it had no jurisdiction to resolve a trademark-infringement claim brought by one sect against the other, as that would

require it to decide the doctrinal issue of proper succession.  The Ninth Circuit reversed, holding that "the district court can apply the regular factors that courts employ to determine infringement" and that "[t]he defendants can raise neutral defenses, such as prior use of the marks." *Maktab*, 179 F.3d at 1249.  Like *Maktab*, the instant case can be resolved based on trademark law, without addressing any doctrinal issues.  Trademark law will not turn on whether the plaintiffs' members or McGill and his congregants are the true believers.[2]

Anticipating the neutral-principles approach, McGill asks us to create an exception to jurisdiction for situations in which "there is (1) religious use of (2) intellectual religious property and the application of neutral principles could, in effect, (3) decide a doctrinal dispute and (4) deprive one party the right to the free exercise of its religion."  Appellant Br. at 13.  In support of his proposed rule, McGill cites a set of cases involving the so-called ministerial exception to employment-discrimination statutes.  The ministerial exception "precludes subject matter jurisdiction over claims involving the employment relationship between a religious institution and its ministerial employees, based on the institution's constitutional right to be free from judicial interference in the selection of those employees."  *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007).  In essence, McGill asks the panel to create an analog to the ministerial exception under trademark law for litigants in his position.

We decline the invitation.  The ministerial exception is a highly circumscribed doctrine.  It grew out of the special considerations raised by the employment claims of clergy, which "concern[] internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law."  *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986).  In fact, in blessing the ministerial exception, the *Hutchison* panel *distinguished* its facts from church property cases.  The panel acknowledged that

---

[2]It is relevant, however, whether "Seventh-day Adventist" describes a church or organization or, instead, a religion.  If it describes a religion, then the term would not be subject to trademark protection. This is not a jurisdictional issue, but rather an issue about the validity of the trademarks.  We address it below in Part C.

the neutral-principles approach governed in church property cases, but emphasized that that approach had never been applied to the realm of clergy employment and discipline. *Id.* It would be a perversion of the case law, and contrary to the *Jones* line of cases, now to carve out an exception to the neutral-principles approach in property cases.

To sum up, the district court properly exercised subject-matter jurisdiction over this case, and we do so now, as well.

**B. RFRA**

McGill claimed below that the enforcement of the plaintiffs' trademarks would violate his Free Exercise Clause rights because his religion mandates him to call his church "Creation Seventh Day Adventist." He argues, in essence, that his religious beliefs *require* him to violate the law and that the enforcement of the law against him is therefore unconstitutional.

In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879 (internal quotation marks omitted) (holding that state could deny unemployment benefits to drug users, including Native Americans who had ingested peyote for sacramental purposes). Under *Smith*, McGill would have no free-exercise defense to trademark law, which is neutral and generally applicable. In 1993, however, Congress enacted RFRA to restore the strict-scrutiny test of *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), that *Smith* had overruled:

(a)  In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b)  Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1. In *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997), the Supreme Court held that the enactment of RFRA, as applied to the states, exceeded Congress's remedial powers under § 5 of the Fourteenth Amendment. The Court has since vindicated the application of RFRA against the *federal* government. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436 (2006) (upholding the grant of a preliminary injunction to potential targets of federal drug prosecution under RFRA).

RFRA would appear to trigger strict scrutiny in this case. For a party to assert RFRA as a claim or a defense, "governmental action must (1) substantially burden, (2) a religious belief rather than a philosophy or way of life, (3) which belief is sincerely held." *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996). So far, no one has questioned the sincerity of McGill's belief that God requires him to continue his infringing use of the plaintiffs' marks. Being compelled to stop could substantially burden his religious practice. *See O Centro Espirita*, 546 U.S. at 426 (government conceded that application of Controlled Substances Act to plaintiffs, who received communion through a sacramental tea containing a Schedule I drug, would substantially burden a sincere exercise of religion). McGill cannot claim the benefit of RFRA, however, because as we explain, the defense does not apply in suits between private parties.[3]

This case presents an issue of first impression in this circuit: whether RFRA applies only in suits against the government or also in suits by private parties seeking to

---

[3]Because we hold that RFRA does not apply to suits between private parties, we do not reach the issues of whether McGill waived the defense by failing to raise it in his answer and whether the district court properly denied leave to amend his answer.

enforce federal law against other private parties. The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party. Then-Judge Sotomayor discussed the relevant provisions in a dissent in the Second Circuit:

> Two provisions of the statute implicitly limit its application to disputes in which the government is a party. Section 2000bb-1(c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*" (emphasis added). . . . When read in conjunction with the rest of the statute, . . . it becomes clear that this section reflects Congress's understanding that RFRA claims and defenses would be raised only against the government. For instance, section 2000bb-1(b) of RFRA provides that where a law imposes a substantial burden on religion, the "*government*" must "demonstrate[] . . . that application of the burden" is the least restrictive means of furthering a compelling governmental interest (emphasis added). The statute defines "demonstrate" as "meet[ing] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). Where, as here, the government is not a party, it cannot "go[] forward" with any evidence. In my view, this provision strongly suggests that Congress did not intend RFRA to apply in suits between private parties.
>
> I recognize that according to RFRA's "applicability" section, the statute applies "to all Federal law." 42 U.S.C. § 2000bb-3. This provision, however, is not inconsistent with a finding that the statute does not apply to suits between private parties. Read in conjunction with the rest of the statute, the provision simply requires courts to apply RFRA "to all Federal law" in any lawsuit to which the government is a party.

*Hankins v. Lyght*, 441 F.3d 96, 114–15 (2d Cir. 2006) (Sotomayor, J., dissenting) (footnotes omitted). We note further that Congress repeatedly referred to government action in the findings and purposes sections of RFRA. Congress found that "*governments* should not substantially burden religious exercise without compelling justification," that the pre-*Smith* regime had required that "the *government* justify burdens on religious exercise," and that strict scrutiny was necessary for "striking sensible balances between religious liberty and competing prior *governmental* interests." 42 U.S.C. § 2000bb(a) (emphases added). Congress described RFRA's purpose as "to

provide a claim or defense to persons whose religious exercise is substantially burdened *by government*." § 2000bb(b) (emphasis added).

RFRA's legislative history supports our view that Congress did not intend the statute to apply against private parties. "All of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. *See* S. Rep. No. 103-111 (1993); H.R. Rep. 103-88 (1993)." *Hankins*, 441 F.3d at 115 n.9 (Sotomayor, J., dissenting).

The majority in *Hankins*, however, saw things differently. It found RFRA's language broad enough to apply "to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her exercise of religion." *Id.* at 103. For three reasons, we do not follow the *Hankins* majority. First, as discussed above, RFRA's text does not support the *Hankins* majority's interpretation. Second, the *Hankins* majority limited its holding to the application of RFRA vis-à-vis federal laws that can be enforced by private parties *and* the government. That case concerned an action under the ADEA by a clergyman who had been forced into retirement. The ADEA claim could have been brought by the EEOC, and the majority sought to avoid disparate application of the statute based on who brings discrimination charges. *Id.* There is no EEOC-like agency that can bring trademark-enforcement actions. Third, a different panel of the Second Circuit already has expressed "doubts about *Hankins*'s determination that RFRA applies to actions between private parties." *Rweyemamu v. Cote*, 520 F.3d 198, 203 (2d Cir. 2008). That panel stated that "we think the text of RFRA is plain," credited Judge Sotomayor's dissent, and concluded that RFRA should not apply to purely private disputes "regardless of whether the government is capable of enforcing the statute at issue." *Id.* at 203 n.2.

Meanwhile, the other two circuits to have reached the issue have held that RFRA does not apply to suits between private parties. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (calling the *Hankins* decision "unsound" and explaining that "RFRA is applicable only to suits to which the government is a party");

*Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000) ("It seems unlikely that the government action Congress envisioned in adopting RFRA included the protection of intellectual property rights against unauthorized appropriation."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837–43 (9th Cir. 1999) (noting that Congress did not specify that RFRA applies to nongovernmental actors, as it typically does when intending to regulate private parties, and holding that private parties could not be considered state actors under RFRA unless they acted jointly with government officials to violate free-exercise rights). We now join their ranks.

## C.  Whether "Seventh-day Adventism" Can Be Trademarked

"The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) (internal quotation marks omitted). "If a mark's primary significance is to describe a type of product rather than the producer, it is generic . . . ." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002). A generic mark cannot be protected as a trademark. *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 513 (6th Cir. 2007). McGill argues that "Seventh-day Adventism" refers to a religion, is therefore a generic term, and thus cannot be trademarked.[4]

---

[4]As the district court explained, the plaintiffs' marks have become "incontestable" under the Lanham Act. *See* 15 U.S.C. § 1065 (explaining that a mark can attain this status if it is registered for five years and no adverse decision as to its ownership or validity has been rendered). In *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236 (6th Cir. 1997), a panel of this court held that because the name of the plaintiffs' religious organization had become incontestable, it could not be challenged on the ground that it was the generic name of a religion. *Id.* at 1240–41 (holding that incontestable marks are "subject only to the eight defenses specified in § 1115(b)"). This holding is directly contradicted by the text of the incontestability provision, which states that "no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered." § 1065(4). The later case *Nartron* correctly articulated the law in stating that a "mark's incontestable status . . . does not protect it from a challenge . . . premised on a claim that it has become generic." *Nartron*, 305 F.3d at 405; *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 195 (1985) ("An incontestable mark that becomes generic may be canceled at any time pursuant to [15 U.S.C. § 1064].").

McGill's argument is certainly logical:  well-known terms that society understands to refer to a particular faith in general are generic, and no single party can prevent others from using them.  *See, e.g.*, *Christian Science Bd. of Dirs. of the First Church of Christ, Scientist v. Evans*, 520 A.2d 1347, 1352–53 (N.J. 1987) ("Christian Science" is a religion and therefore a generic name not entitled to trademark); *McDaniel v. Mirza Ahmad Sohrab*, 27 N.Y.S. 2d 525, 527 (N.Y. Sup. Ct. 1941) (holding that Baha'ism is a religion and that the use of word "Baha'i" could not be enjoined because "members of the same religion[] have an equal right to use the name of the religion"); *New Thought Church v. Chapin*, 159 A.D. 723, 724–25 (N.Y. App. Div. 1913) (denying injunction because plaintiffs claimed that "New Thought" referred to a religion and they could not "claim a monopoly of teaching this form of religious faith"); *cf. TE-TA-MA Truth Found.-Family of URI, Inc. v. World Church of the Creator*, 297 F.3d 662, 666 (7th Cir. 2002) ("Church of the Creator" describes a Christian denomination, not a religion, and is not generic); *Nat'l Spiritual Assembly of the Baha'is Under the Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of the Baha'is, Inc.*, 150 U.S.P.Q. 346, 354 (N.D. Ill. 1966) (enjoining defendants' use of "Baha'i" because "the public has come to recognize the designation[] 'Baha'i' . . . as identifying the [plaintiff organization] and the Baha'i Faith as administered by [it]").

This circuit has held that "[w]hether a name is generic is a question of fact." *Bath & Body Works*, 76 F.3d at 748.  "The appropriate test for genericness is whether the public perceives the term primarily as the designation of the article."  *Id.* (internal quotation marks omitted).  It would be inappropriate to conclude as a matter of law, regardless of the evidence that could be adduced (and that was presented at summary judgment in this case), that the public considers "Seventh-day Adventist" to refer generically to a religion.[5]  *See Gen. Conference Corp. of Seventh-day Adventists v. Seventh-day Adventist Congregational Church*, 887 F.2d 228, 230–31 (9th Cir. 1989) (judgment on the pleadings was improper because defendants argued that Seventh-day Adventism was a religion and thus generic); *Gen. Conference Corp. of Seventh-day*

---

[5]In their reply to McGill's response to their summary-judgment motion below, the plaintiffs stated that their organization's "members are followers of the Christian faith."  SJ Reply at 2 (Doc. 59).

*Adventists v. Perez*, 97 F. Supp. 2d 1154, 1162 (S.D. Fla. 2000) (court, sitting as factfinder after a bench trial, found that "Seventh-day Adventist" referred to the plaintiffs' church, not a religion, in the eyes of the public); *Stocker v. Gen. Conference Corp. of Seventh-day Adventists*, 39 U.S.P.Q. 2d 1385, 1996 WL 427638, at *11–17 (Trademark Tr. & App. Bd. 1996) (reviewing testimony, reference materials, and survey evidence and concluding that petitioners had not met burden of establishing genericness for cancellation of trademark). *But see Gen. Conference Corp. of Seventh-day Adventists v. Seventh-day Adventist Kinship, Int'l, Inc.*, No. CV 87-8113, 1991 WL 11000345, at *6–7 (C.D. Cal. Oct. 7, 1991) (holding, apparently as a matter of law, that "Seventh-day Adventist" has a dual meaning, referring to the church and to adherents of the religion, and that a support group for gay and lesbian followers could use the term; but also noting that the result might be different if the defendants had used "Seventh-day Adventist" as part of a church's name).

McGill makes one last effort to secure a legal ruling of genericness. He argues that the plaintiffs here should be collaterally estopped from denying that "Seventh-day Adventist" refers to a religion because that issue was decided in *Benn v. Seventh-day Adventist Church*, 304 F. Supp. 2d 716 (D. Md. 2004). In *Benn*, a student in Trinidad injured himself on a weekend retreat sponsored by an organization affiliated with the General Conference's church, and he sued the "Seventh-Day Adventist Church" in tort. The district court found that "there is no legal entity known as the 'Seventh-Day Adventist Church'" and further remarked that "the Seventh-Day Adventist Church is a religion, not a cognizable legal entity." *Id.* at 721. Inferring that the student intended to sue the General Conference (one of the plaintiffs in the instant case), the court noted that it could substitute that entity as the defendant. But because the General Conference is an unincorporated corporation, the district court had to consider the citizenship of its constituent unions and missions for diversity purposes. Some of those constituent parts were aliens, like the student himself, destroying diversity. *Id.* at 721–22. The case therefore turned on the fact that the student had sued a nonentity and that the substitution of the entity he had intended to sue removed subject-matter jurisdiction. Thus, collateral estoppel does not apply because the issue of whether Seventh-day Adventism is a

religion, even if it were actually decided, was not necessary to the outcome in *Benn*.  *See Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 367 (6th Cir. 2009).

McGill has a stronger claim for judicial estoppel based on arguments made by the General Conference Corporation in a memorandum in *Benn*, which McGill included in the record in the district court.  The plaintiff-student in *Benn* added the General Conference Corporation as a defendant in his amended complaint.  In opposing the student's motion to file a second amended complaint, the General Conference Corporation contended that dismissal was required and argued the following:  "By naming the 'Seventh-day Adventist Church' as a defendant, Plaintiff attempts to sue a religion rather than a religious institution. . . . [T]he Seventh-day Adventist Church is a religion that may be treated as an 'unincorporated association' only by resorting to an unconstitutional fiction."  *Benn*, No. 03-330, Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl. (filed as attachment to McGill's Brief in Support of Motion to Dismiss, Doc. 30-11).  We have previously discussed the contours of judicial estoppel:

> The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition.  A court should also consider whether the party has gained an unfair advantage from the court's adoption of its earlier inconsistent statement.  Although there is no set formula for assessing when judicial estoppel should apply, it is well-established that at a minimum, a party's later position must be clearly inconsistent with its earlier position for judicial estoppel to apply.  Moreover, the doctrine of judicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement.

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (citations and internal quotation marks omitted).  It is clear that the General Conference Corporation gained no unfair advantage in *Benn* from that court's crediting its argument that "Seventh-day Adventist Church" refers to a religion.  The dispositive points in that case were that "Seventh-day Adventist Church" was not a jural entity and

that the intended defendant, the unincorporated General Conference, was not diverse from the plaintiff. Accordingly, judicial estoppel does not apply.

## D. Summary Judgment

Finally, McGill challenges the district court's grant of summary judgment to the plaintiffs on trademark infringement of the mark "Seventh-day Adventist." The plaintiffs claim that the default-judgment order moots this issue because that order resolved the entire case—that is, it provided an independent basis for granting relief as to the "Seventh-day Adventist" mark. McGill replies that the default-judgment order pertained only to those claims that were not resolved at summary judgment.

Both parties find support for their positions in the district court's own language. As McGill points out, the district court concluded the default-judgment order by stating that "default judgment will be awarded to the Plaintiffs on their *remaining claims*." *McGill*, 2009 WL 1505738, at *7 (emphasis added). On the other hand, other language in the order suggests that the order encompassed all claims. After declining the plaintiffs' request to extend the grant of partial summary judgment to cover the other marks based on the safe-distance rule,[6] the district court noted that "default judgment as a sanction provides an alternative and independent ground upon which this Court may grant the Plaintiffs' request for a permanent injunction." *Id.* at *6. The same order provided the language of the preliminary injunction, which included a prohibition on McGill's use of "Seventh-day Adventist." *Id.* at *6 n.9. Furthermore, in denying McGill's motion to stay the injunction pending appeal, the court remarked that "this case was not decided on the merits of the claims." Order Denying Mot. to Stay at 3 (Doc. 103). It explained that the case had been resolved on default judgment based on "the Defendant's willful refusal to comply with this Court's pretrial orders." *Id.* That order, however, came down after McGill had filed his notice of appeal, and we cannot say with confidence either that it merely clarified or that it sought to modify the default-judgment

---

[6]Under this rule, advanced in *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir. 1930), a party can "be required to keep a safe distance away" from using terms that resemble the validly trademarked terms, even though the former are not themselves protected. *Id.* at 354.

order.  Under these circumstances, and given that McGill fully and properly litigated the summary-judgment stage, we take the summary-judgment order as properly before us.

Summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  This court's focus must be on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  In conducting that inquiry, we draw all reasonable inferences in favor of the nonmoving party. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

To prevail on their claim that McGill infringed their "Seventh-day Adventist" mark, the plaintiffs had to prove that their trademark was valid and that McGill's use of the mark was likely to cause confusion among the relevant consumers of the parties' services and materials. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

On validity, we agree with the district court first, that the mark is presumptively nongeneric and that McGill bore the burden of proving otherwise (because the marks had become "incontestable," which McGill did not challenge), and second, that he could not carry that burden.  As noted above, the test for whether a term is generic and therefore ineligible for trademark protection is "whether the public perceives the term primarily as the designation of the article." *Bath & Body Works*, 76 F.3d at 748 (internal quotation marks omitted).  McGill's argument for genericness is that "Seventh-day Adventist" describes a religion, but he offers scant evidence that *the public* perceives the term as referring to a particular set of beliefs rather than to the plaintiffs' church.  McGill works to show that the plaintiffs' evidence—previous judicial rulings, survey evidence, expert testimony—does not establish nongenericness by a preponderance of the evidence, but this approach gets the burden of persuasion backwards.  His own evidence consists of (1) his personal testimony and that of a theology graduate student, (2) a dictionary definition, (3) a Wikipedia entry, (4) the fact that the plaintiffs use "Seventh-day Adventist" as a noun rather than an adjective, and (5) the fact that two breakaway

churches use the term in their names. McGill's testimony does not provide an objective appraisal of the public's view, and the graduate student's opinion does not appear to be based on any study of popular perceptions. The dictionary and Wikipedia entries, meanwhile, concern the term "Adventist," not "Seventh-day Adventist." And the noun/adjective distinction goes not to genericness but to descriptiveness, which is no shield against a mark that has become incontestable. *Park 'N Fly, Inc.*, 469 U.S. at 196. Finally, the existence of the breakaway churches does little to help McGill. As the district court wrote, "[i]f anything, the fact that the Defendant can point to only two other splinter groups founded in the last century that bear the name supports the conclusion that members of the relevant public would generally associate the term with the churches affiliated with the General Conference." *McGill*, 624 F. Supp. 2d at 894.

Even taking the relevant public as "Christians and, more specifically, Adventist Christians (that is, those who believe in the nearness of the second coming of Christ)," *Stocker*, 1996 WL 427638, at *11, 17, McGill has adduced insufficient evidence to show that this group would understand "Seventh-day Adventist" as referring to certain religious beliefs rather than to the plaintiffs' church.

We likewise agree with the district court that no reasonable jury could find other than that McGill's use of the mark is likely to cause confusion among the public. The plaintiffs retain the burden of persuasion on this element. *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 694 (6th Cir. 2003). The following factors should be considered in determining likelihood of confusion: "1) the strength of the senior mark; 2) relatedness of the goods and services; 3) the similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels used; 6) likely degree of purchaser care; 7) the intent of the defendant in selecting the mark; and 8) the likelihood of expansion of the product lines." *Id.* The district court considered these factors and found that "[a]lmost every single factor weighs in the Plaintiffs' favor; those that do not are less worthy of consideration when they favor an alleged infringer." *McGill*, 624 F. Supp. 2d at 900.

We will not review each factor here; suffice it to say that we concur with the district court's thoughtful and thorough review of the evidence. Instead, we address McGill's main challenge to the district court's analysis, that it misjudged the factors in light of the identity of the relevant public. McGill argues that the relevant public—those who believe in the imminence of Christ's return and that the Sabbath should be observed on Saturday—are so discerning that there is a genuine issue of material fact about the likelihood that they would confuse McGill's church for the plaintiffs' church. But while it may indeed be hard to envision a person mistakenly joining the wrong church, it is not at all difficult to imagine a person consuming McGill's published materials and ascribing his teachings to the General Conference, especially in light of the relatedness of the parties' services and similarity of the marks. Accordingly, we agree that the plaintiffs were entitled to summary judgment on the likelihood of confusion, and we uphold the district court's judgment as to the mark "Seventh-day Adventist."[7]

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's denial of McGill's motion to dismiss, its grant of partial summary judgment to the plaintiffs, and its default judgment against McGill.

---

[7]McGill raised a number of defenses in his answer, but he did not argue them at summary judgment and he does not do so on appeal.